RECEIPT # 43061

AMOUNT $ 150

SUMMONS ISSUED Y-2

LOCAL RULE 4.1

WAIVER FORM

MCF ISSUED

BY DPTY. CLK. PR

DATE 12-19-02

FILED
IN CLERKS OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2002 DEC 19  A 10: 55

U.S. DISTRICT COURT
DISTRICT OF MASS.

COMMONWEALTH OF MASSACHUSETTS, )
)
            Plaintiff,              )     Civil Action No.
)
        v.                          )
)
INTEGRATED CREDIT SOLUTIONS, INC.; and )
FLAGSHIP CAPITAL SERVICES CORP.     )     COMPLAINT
)
            Defendants.             )
_____)

02 CV 12431 JLT

## INTRODUCTION

1.      The Telephone Consumer Protection Act of 1991 ("TCPA") prohibits the

commercial use of unsolicited, pre-recorded telephone messages. 47 U.S.C. § 227(b)(1)(B) & 47

C.F.R. 64.1200.  Integrated Credit Solutions, a for-profit telemarketer based in Largo, Florida,

has delivered thousands of pre-recorded phone messages to consumers in Massachusetts and

millions of messages nationwide, in violation of the TCPA.  This is an action by the

Massachusetts Attorney General to enjoin the defendants' continued violation of the TCPA and

to recover statutory damages on behalf of Massachusetts residents. 47 U.S.C. § 227(f).

2.      This civil action also is brought by the Attorney General in the public interest

pursuant to G.L. c. 93A, § 4 arising out of the defendants' unfair and deceptive acts and practices

in connection with the solicitation and sale of goods and services related to credit counseling.

Beyond violating the TCPA on a massive scale, the defendants have deceptively induced

thousands of consumers to pay exorbitant "enrollment" and "education" fees to ICS, a for-profit

DOCKETED
①

telemarketer, in order to receive credit counseling from Lighthouse Credit Foundation, which purports to be an independent, nonprofit credit counseling organization.

3.     The defendants' conduct violates G.L. c. 93A, § 2, the Attorney General's regulations promulgated thereunder, and the Telemarketing Sales Rule, 16 C.F.R. Part 310.  By this action, the Attorney General seeks permanent injunctive relief prohibiting the defendants from committing unfair and deceptive acts and practices in the future.  The Attorney General also seeks restitution for persons injured by the defendants' unlawful actions, civil penalties, attorneys' fees, and the costs of prosecuting this action, pursuant to G.L. c. 93A, § 4.

## JURISDICTION AND VENUE

4.     This court has jurisdiction over the subject matter and defendants of this action pursuant to 47 U.S.C. § 227(f), 28 U.S.C. § 1331 and 28 U.S.C. § 1367.  The Commonwealth's claims against defendants under Massachusetts law, G. L. c. 93A, §4, arise from the same facts as the Commonwealth's Federal claims and are so related to these Federal claims as to form part of the same case or controversy.  This court thus has supplemental jurisdiction over the Commonwealth's state claims pursuant to 28 U. S. C. § 1367(a).

5.     In accordance with 47 U.S.C. § 227(f) and 28 U.S.C. § 1391, venue is proper in the District of Massachusetts.

## THE PARTIES

6.     The plaintiff is the Commonwealth of Massachusetts, represented by the Attorney General who brings this action in the public interest pursuant to G.L. c. 93A, § 4, G.L. c. 12, § 10, and 47 U.S.C. § 227(f).

2

7.      The defendant, Flagship Capital Services Corp. ("Flagship") is a California for-profit corporation with its principal place of business at 8550 Ulmerton Road, Suite F200, in Largo, Florida 33771.  Prior to a name change in March 1999, Flagship was known as Twenty-First Century Lending Corp. ("Twenty-First Century").

8.      The defendant, Integrated Credit Solutions, Inc. ("ICS") is a Florida for-profit corporation and a wholly owned subsidiary of Flagship.  ICS has its principal place of business at 8550 Ulmerton Road, Suite F200, in Largo, Florida 33771.  ICS was incorporated by Corporate Creations International on April 27, 2000 as Flagship Capital Arbitration Services Corp. and changed its name to ICS on June 28, 2000.

## FACTS

9.      Prior to 2000, Twenty-First Century sold mortgage loans, specializing in debt consolidation, home improvement and "sub-prime" mortgage lending.  Flagship, initially as a division of Republic Bank, also was a sub-prime mortgage lender.  In approximately April 1999, Twenty-First Century and Flagship merged and became Flagship.  Flagship was re-capitalized by investments from dozens of individuals, including several Flagship officers and Tom Hewitt, the sole shareholder of Twenty First Century.  Flagship had recently exited the sub-prime mortgage lending market and was seeking a new business.

10.     Beginning in approximately the summer of 2000, Flagship undertook to become a "customer acquisition" company through its wholly-owned subsidiary, Integrated Credit Solutions.  Since then Flagship has engaged primarily -- if not exclusively -- in telemarketing, through ICS.  Flagship directly controls ICS and the companies share the same management. (References to ICS in this Complaint refer to ICS and Flagship).

3

11.     ICS operates a telemarketing call center in Largo, Florida.  ICS, directly or

through its contractors, sends out thousands and sometimes millions of unsolicited pre-recorded

phone messages daily to United States households, delivering a sales pitch and urging consumers

to contact ICS.  ICS telemarketers then field incoming phone calls at ICS's call center.  ICS

telemarketers solicit payment of enrollment or educational fees to ICS, in order for consumers to

"enroll" in credit counseling offered by Lighthouse Credit Foundation.  ICS telemarketers also

have solicited new customers for mortgage lenders.

### Lighthouse Credit Foundation and ICS

12.     Lighthouse Credit Foundation, Inc. ("Lighthouse") is a Florida not-for-profit

corporation with its principal place of business 8550 Ulmerton Road, Suite 150, in Largo, Florida

33771, and previously at other offices also located at 8550 Ulmerton Road.  Lighthouse was

incorporated by Corporate Creations International on July 13, 2000 as Capital Credit Foundation,

Inc. and changed its name to Lighthouse on November 10, 2000.  Lighthouse purports to be a

charitable and educational organization that provides credit counseling/debt management

services to consumers, and has claimed exemption from federal income tax pursuant to Section

501(c)(3) of the Internal Revenue Code.

13.     Lighthouse, like many other credit counselors, claims to assist consumers in

paying unsecured debts (*e.g.*, credit cards) by:

> i) negotiating with creditors, on the consumer's behalf, to decrease creditor interest rates
> and/or decrease or eliminate late charges and other penalties and fees;
>
> ii) preparing a debt payment schedule agreeable to the debtor and his or her creditors; and
>
> iii) collecting monthly scheduled payments from the debtor and distributing payments to
> creditors.

14.     Lighthouse, like most credit counselors, receives "fair share" payments from institutional creditors for debts paid through its credit counseling program. That is, creditors pay credit counselors a percentage of debt repaid through a credit counseling program. Institutional creditors typically pay "fair share" only to non-profit organizations. Further, statutes in many states (including Massachusetts) require credit counselors to be non-profit organizations. For those reasons, most (if not nearly all) credit counselors are non-profit organizations.

15.     By the summer of 2000, ICS was commencing its telemarketing business, using automatically dialed, pre-recorded phone messages. ICS had begun soliciting "enrollment fees" from new credit counseling clients and was referring new enrollees to Alternative Credit Solutions, a non-profit credit counselor in Largo, Florida.

16.     In or about July 2000, Mary Melcer, president and director of Lighthouse, founded Lighthouse as a not-for-profit, educational and charitable corporation, which intended to offer credit counseling/debt management services (hereafter collectively referred to as "credit counseling").

17.     Prior to founding Lighthouse, Melcer was employed by Flagship as senior vice president of mortgage banking operations, and was part of Flagship's management team. Like other Flagship personnel, Melcer previously worked under Steve McWhorter (CEO of Flagship and ICS) and Mickey Malone (vice president of Flagship and ICS) at Republic Bank, where Melcer served as a senior vice president of mortgage operations. Melcer was, and remains, one of the investors in the re-capitalized Flagship. Melcer owned, and continues to own, approximately four percent (4%) equity in privately-held Flagship.

18.     Mary Melcer had no prior experience in credit counseling or managing non-profit

5

organizations. In early summer 2000, Melcer discussed with other Flagship managers, including McWhorter and Malone, the idea of Melcer establishing a non-profit to service new clients solicited by ICS. Shortly thereafter, Melcer left her employment at Flagship and established Lighthouse.

19.     From the summer of 2000, Lighthouse prepared to begin operations as a credit counselor and ICS ramped up its telemarketing operations directed at acquiring new customers for credit counselors. To help Lighthouse get started, ICS paid Lighthouse $65,000.00, in an undocumented transaction. Initially, Lighthouse shared ICS's office space, and ICS deferred Lighthouse's obligation to pay rent. Lighthouse and ICS also shared the same telephone system. Lighthouse subsequently moved to a different office in the same complex as ICS.

20.     Beginning in approximately the first quarter of 2001, ICS began using pre-recorded phone messages to solicit enrollment fees, payable to ICS, to "enroll" new credit counseling clients with Lighthouse, and Lighthouse began offering credit counseling services to clients referred by ICS.

21.     Although ICS charged hundreds of dollars to enroll customers in Lighthouse and Lighthouse paid a percentage of administrative fees back to ICS, initially no written contract governed the relationship. On information and belief, ICS and Lighthouse essentially operated as parts of the same business enterprise. In approximately July 2001, ICS and Lighthouse signed a contract by which ICS conducts telemarketing to acquire new clients for Lighthouse's credit counseling services. That contract allowed ICS to charge and collect enrollment fees in any amount for obtaining new Lighthouse clients. The contract also provided that Lighthouse would charge a monthly administrative fee of $35.00 per client (later changed to $38.00), and would

6

pay $25.00 of each monthly fee to ICS, with respect to each client initially obtained by ICS.

22.     Since Lighthouse began providing credit counseling, the vast majority of Lighthouse's clients have been obtained through ICS's telemarketing operation and have paid up-front enrollment fees to ICS.  Likewise, since ICS began soliciting customers for non-profit credit counselors, the vast majority of clients obtained by ICS have been directed to Lighthouse, after paying ICS's up-front fee.

23.     Although for-profit ICS and non-profit Lighthouse claim to be independent, the two companies work in tandem to generate profit for ICS/Flagship.  The vast majority of fees paid by consumers for credit counseling – 100% of the up-front fee and 70% of all continuing monthly fees – flow to ICS, not Lighthouse.  On information and belief, the establishment of Lighthouse was part of a business plan by Flagship's management, including Melcer, Malone, McWhorter and others, to generate profit for Flagship by using ICS's telemarketing operation to solicit up-front fees directly to Flagship and additional fees to Flagship, all through the controlled relationship with Lighthouse.

### ICS's Solicitation of "Enrollment" Fees for Credit Counseling

24.     During or before April 2001, ICS began sending pre-recorded voice messages to households in Massachusetts and nationwide, either directly or through third party contractors.  ICS used automatic dialing equipment to dial residential phone numbers in Massachusetts and leave pre-recorded advertising messages on answering machines.  If a live person picks up the ICS call, the equipment disconnects the line.  Accordingly, the initial communication from ICS to a prospective consumer is almost uniformly by pre-recorded phone message.

7

25.     The initial message from ICS typically identifies a pseudonym caller at ICS,

refers to a recent "approval letter" related to consolidating credit card debt, offers to lower

interest rates to as low as 1.5% (or 1.9%), and urges the recipient to call ICS at a toll-free

number.  Although ICS used various pre-recorded messages over time, one typical message left

at thousands of Massachusetts households, stated:

> "Hi, this is Jim Collins calling from ICS. You may recall receiving an approval letter stating that you
> had been approved to consolidate your credit cards down to as low as 1.5%. This is not a new
> loan, and again, you've already been approved by a certified non-profit agency.  In order to lower
> your rates before your next billing cycle, I do need to find out what your balances are presently.  If
> you could please have your statements ready when you call, my number is 800-774-1130 and my
> name again is Jim Collins.  You can reach me up until 10:00 p.m. eastern time, Monday through
> Friday. Thank you.

26.     Consumers that seek credit counseling typically maintain debt burdens that

exceed their monthly income, carry credit card debt month to month, may be facing bankruptcy,

and usually are desperate to save money and reduce interest costs.  ICS, in its advertisements and

through its sales tactics, exploits this desperation by falsely promising extremely low interest

rates and significant savings, all through a "certified non-profit agency."

27.     The pre-recorded messages left by ICS are designed to mislead consumers and, in

fact, are misleading because the messages:

i) state that the recipient has received some form of "approval letter" when, in fact, ICS's
phone message is not preceded by any written communication;

ii) generate the misimpression that ICS offers a low-interest credit card with which
consumers can consolidate existing debts, when ICS offers no credit card or other
extension of credit;

iii) state that ICS offers credit with interest rates as low as 1.5% when ICS offers no
interest rates and when credit counseling cannot typically achieve an overall interest rate
at or near 1.5%;

iv) state that the message recipient has already been approved (for something, presumably a new credit card) by a non-profit agency when no approval has occurred and when the recipient may not qualify for credit counseling; and

v) generate the misimpression that the caller, ICS, is a certified non-profit agency that will provide the promised services, while failing to disclose that ICS is a for-profit telemarketer that charges hundreds of dollars but does not provide the promised services.

ICS's initial pre-recorded messages also are misleading because ICS does <u>not</u> disclose: a) what services it is selling – ICS does not even mention credit counseling, enrollment services, or financial education; b) the cost of the services it offers – either in up-front fees or recurring monthly charges; c) that another company will actually be providing those services; and d) that, even though a different non-profit company will provide the yet to be disclosed services, ICS is a for-profit company and charges hundreds of dollars in order for consumers to "enroll."

28.     Consumers who call ICS's toll-free number in response to ICS's message reach a telemarketer at ICS. ICS trains its telemarketers and provides telemarketing scripts to be used by sales agents in handling all calls received by ICS. ICS has revised its sales scripts numerous times from 2001 forward. Prior to adoption, ICS's telemarketing scripts are approved by ICS Senior Vice President Thomas Hewitt and bear a date of adoption. Notwithstanding the script revisions, the ICS solicitation process discussed below remained materially consistent.

29.     ICS telemarketers, handling in-bound calls responding to ICS's pre-recorded message, identify themselves as a "senior counselor," prepared to discuss "reducing your interest rates" through ICS's "accelerated payment program." ICS initially inquires whether prospective customers: a) have at least $4,000 in unsecured debt or, if less than $4,000, are behind on their monthly payments; and b) pay interest rates of 12% or higher on their unsecured debt. Contrary to ICS's initial phone message – which promised interest rates as low as 1.5% and that

9

consumers were "already approved" – ICS typically terminates the telemarketing call with those

persons who do not have at least $4,000 in unsecured debt with interest rates at or above 12%.

30.     ICS telemarketers then explain to prospective customers that ICS works with

"certified non-profit organizations" that have been "empowered by your credit card companies to

lower your rates." ICS asks the prospective customer to disclose to ICS, with respect to each

credit card, the consumer's total outstanding debt, creditors, interest rates, and minimum monthly

payment, so that ICS may conduct a "Savings Analysis." ICS states that its "Savings Analysis"

will determine how much money a consumer can save by participating in credit counseling.

31.     To perform the savings analysis, ICS telemarketers refer to a schedule of creditors

that lists each creditor, the interest rate it will charge to credit counseling clients, and the

minimum monthly payment due for such clients. Creditors generally offer the same terms to all

non-profit credit counselors. Some creditors reduce interest rates charged to credit counseling

clients, to various rates between 6.00% and 25.90%; a small number of creditors eliminate

interest charges; and a similar number offer no reduction in interest rates. Creditors also dictate

their terms with respect to monthly payments due (for instance, that at least 2 percent of the

original outstanding balance must be paid each month).

32.     After comparing a prospective client's current interest rates and minimum

monthly payments with the creditor schedule, the ICS telemarketer uniformly advises the caller

that ICS can provide significant savings in reduced interest rates and can eliminate the caller's

debt in a certain time period, typically ranging between three and five years. ICS claims that its

program, which it calls the "accelerated payment program" will save thousands of dollars by

lowering interest rates and keeping the client's monthly payment consistent over the program

term of several years.

33.   ICS, however, only provides information concerning purportedly lower interest rates and monthly payments; ICS provides no *actual* savings analysis that takes into account the costs of the program, including the effect of ICS's up-front fee and Lighthouse's monthly fees. ICS also does not disclose the total cost of credit counseling, for instance, the total fees paid to ICS and Lighthouse over the payment schedule.  Following the "savings analysis," ICS proposes a monthly payment schedule and solicits the caller to enroll in the credit counseling program.

34.   When explaining the proposed payment schedule and claiming that ICS offers significant savings, ICS often fails to disclose or to disclose adequately that the credit counselor charges a monthly fee of $35.00 or $38.00 – termed a monthly "administrative fee" – which is paid to the credit counselor, not toward relieving debt.  Even when ICS began disclosing the monthly "administrative fee," ICS misrepresented the purpose of the monthly fee, including by failing to disclose that $25.00 of each monthly fee to non-profit Lighthouse is paid over to for-profit ICS.

35.   When explaining its "savings analysis" and claiming that ICS offers significant savings, ICS failed to disclose, or failed to timely disclose, that ICS charges an "enrollment fee" of hundreds of dollars in order to enroll in credit counseling.  Only after promising reduced interest rates, a monthly payment schedule, and freedom from debt in a certain number of years, does ICS disclose its fee, payable up front and before the caller may speak with the non-profit credit counselor.  From 2001 forward, ICS charged fees ranging between $99.00 and $499.00 for enrollment in non-profit credit counseling.  ICS does not refer would-be clients to non-profit Lighthouse unless they pay up-front fees to ICS.

36.     The "savings analysis" provided by ICS to prospective clients to induce payment

of enrollment fees to ICS is fundamentally misleading to consumers because ICS's savings

claims fail to account for the impact of ICS's enrollment fee and Lighthouse's monthly

administrative fees upon the purported savings.  By disclosing only the reduced interest rates, the

monthly scheduled payment and the program's duration, ICS avoids disclosing the significant

total fees paid to ICS and Lighthouse during the program term and the impact of those fees upon:

actual savings, purported savings on interest, the total amount paid to retire debts, and the

duration of payments to retire debt.  The fees paid to ICS and Lighthouse significantly reduce

any "savings" achieved through their credit counseling program, rendering ICS's savings claims

misleading.  On information and belief, a significant number of ICS-enrolled clients achieve no

savings or *de minimus* savings through credit counseling because, for example, the up-front and

monthly fees to ICS and Lighthouse offset any reductions in interest rate available to credit

counseling clients.

37.     ICS's savings claims also are fundamentally misleading because ICS fails to

disclose the basis for its comparative savings claims.  ICS claims that reduced interest rates and a

regular monthly payment schedule will save thousands of dollars in interest and eliminate debt in

"one-third" the amount of time.  ICS fails to disclose that its savings claims are based upon a

comparison between a credit counseling program and a debtor who pays only their monthly

minimum payment for the life of the debt.  Absent disclosure of that presumption, ICS's

comparison drastically overstates savings achieved through credit counseling.  ICS also fails to

disclose a comparison between the ICS-offered credit counseling program and a person who pays

the same monthly amounts directly to creditors without using and paying fees to ICS and

12

Lighthouse.  On information and belief, such a comparison would show that the ICS-offered

program offers many clients little or no savings because ICS and Lighthouse's fees offset any

reduction in interest rates or other savings.

38.     ICS also misrepresents to prospective customers that the credit counseling

services it offers are "not-for-profit" in nature.  ICS represents Lighthouse as a "certified" non-

profit and a "true non-profit" that has "the customer's best interest in mind by keeping excessive

charges down and also by offering continued education programs."  ICS has referred to its up-

front fee as a "Program Service Contribution," implying that the fee was a voluntary donation.

ICS fails to disclose that the vast majority of fees paid by clients in order to receive non-profit

Lighthouse's services are, in fact, paid to for-profit ICS:  ICS receives 100% of the up-front fee

paid to enroll with Lighthouse and ICS receives roughly 70% of all monthly fees paid to

Lighthouse.  In light of the undisclosed business relationship between ICS and Lighthouse and

that a majority of client fees ultimately go to for-profit ICS, ICS misleads potential clients by

highlighting Lighthouse's non-profit status in its marketing efforts.

39.     In addition to the above, to induce consumers to pay ICS enrollment fees to

receive credit counseling, ICS telemarketers have misrepresented the terms, conditions and

purported benefits of credit counseling and failed to disclose material facts concerning credit

counseling, including:

  a) misrepresenting that the monthly administrative fees payable to Lighthouse were tax-
  deductible;

  b) misrepresenting that the up-front enrollment fee to ICS was "free" because ICS would
  issue a certificate that could be used for the client's final payment in the credit counseling
  program, and failing to disclose all terms and conditions applicable to use of that
  "certificate";

c) failing to disclose or adequately disclose that credit cards must be cancelled in order to participate in credit counseling;

d) misrepresenting that interest rates would be reduced immediately, and failing to disclose that interest rate reductions typically are not effective for several months;

e) misrepresenting that late charges and penalties would be removed immediately, and failing to disclose that such charges may not be removed or may be removed only after several months; and

f) misrepresenting that a client's payments to creditors were "deferred" for the first month or that ICS would make the first monthly payment in the program, when ICS and Lighthouse do not make any such payment.

40.     For consumers interested in enrolling in credit counseling, ICS seeks verbal authorization to withdraw from the client's bank account an enrollment fee, which it sometimes has called a "Program Service Contribution." ICS also verifies with the new client the credit accounts entering the program, the scheduled monthly payment, and the monthly due date. At the "verification" stage, often for the first time, the ICS telemarketers disclose the monthly administrative fee and the amount of ICS's up-front enrollment fee.

### ICS's Transfer of Customers to Lighthouse

41.     After obtaining ICS's enrollment fee and "verifying" the client's willingness to pay a certain amount monthly on a certain date, ICS transfers the client to Lighthouse. Lighthouse generally collects or confirms the same information from the client concerning their debts and proposes a payment schedule – which should be the same as that provided by ICS – based on the industry standard terms made available by creditors. The "credit counseling" provided by Lighthouse is essentially identical to what occurs during ICS's telemarketing solicitation, that is, proposing a payment schedule based upon standard creditor requirements and obtaining the client's agreement to make payments.

14

42.    With respect to some consumers, however, Lighthouse proposed a monthly payment that materially exceeded the payment schedule quoted by ICS that induced the client to "enroll" and pay ICS's up-front fee.  Other consumers learned of Lighthouse's monthly administrative fee for the first time from Lighthouse.  If consumers, after learning of these increased costs, requested a refund of their enrollment fees, they were told that ICS's up-front fee is non-refundable – even though the terms promised by ICS were changed.  Some consumers received refunds from ICS only after lodging complaints with the law enforcement agencies, and often only after excessive delays.

43.    After telephone communication with a new client, Lighthouse forwards each client a "new enrollment" package, even though the client already has paid ICS hundreds of dollars to "enroll" in credit counseling.  Lighthouse requires that new clients sign and return: a) a "Client Agreement," b) a form containing "Client Disclosures"; and c) an Auto-Payment Authorization Form, authorizing Lighthouse to debit the client's checking account automatically each month; and d) a "creditor information sheet" identifying creditors and debts to each (collectively referred to as the "Lighthouse enrollment documents").

44.    The Lighthouse enrollment documents contain numerous terms and conditions, and limitations on Lighthouse's services, that were not disclosed by ICS at the time ICS "enrolled" new clients and charged its up-front fee.  Certain of these terms, conditions, and limitations of Lighthouse's services conflict with the savings claims made by ICS in order to induce payment of "enrollment fees" to ICS.  If a new client declines to enroll with Lighthouse after reviewing Lighthouse's full terms and conditions, ICS makes it exceedingly difficult to obtain a refund of the "enrollment" fee already paid to ICS.  Lighthouse directs refund requests

15

to ICS. Cancelling consumers experience unreasonable delays trying to reach ICS. Even when ICS agreed to provide refunds, it required consumers to wait unreasonably long periods before their money was returned.

45.    If new enrollees seek a refund of their up-front fee from ICS, ICS notifies the consumer that he or she will be terminated from the Lighthouse credit counseling program, even though Lighthouse, at least nominally, does not charge an enrollment fee and even if the client has otherwise complied with Lighthouse's program.

46.    Once enrolled, clients pay their scheduled monthly payment to Lighthouse, which includes the debt payment and a monthly "administrative" fee to Lighthouse ($35.00 or $38.00 monthly). Lighthouse, in turn, takes its fee and disperses the rest as payments to creditors monthly. For clients initially "enrolled" by ICS, Lighthouse pays $25.00 of each monthly fee to ICS. Neither Lighthouse nor ICS disclose to clients or prospective clients that the majority of monthly "administrative" fees to Lighthouse are paid to ICS/Lighthouse.

47.    Both ICS and Lighthouse misrepresent to clients the nature and purpose of the monthly "administrative" fee charged by Lighthouse, claiming that the monthly fee is necessary to cover non-profit Lighthouse's overhead costs. ICS and Lighthouse fail to disclose that the majority of monthly administrative fees are ultimately paid to ICS to fund its for-profit telemarketing operations and generate profit for ICS's owners. Adding to this misrepresentation, ICS and Lighthouse also fail to meaningfully disclose to clients that Lighthouse's operations are funded by "fair share" payments from creditors. Lighthouse received $1.744 million from creditors in 2001 and $3 million in the first six months of 2002.

16

**ICS Changes Form of Up-Front Enrollment Fee to Selling a "Financial Toolkit"**

48.     During 2001, ICS framed its up-front fee as an "enrollment" fee.  In essence, ICS

sought to generate a market for Lighthouse's "non-profit" credit counseling through aggressive

telemarketing and served as a for-profit gatekeeper for Lighthouse.  Consumers could obtain the

purported benefits of Lighthouse's credit counseling only after paying ICS's fee.  ICS's

enrollment fee varied between $99.00 and $499.00 during 2001.  ICS sometimes framed its fee

as a flat fee (in an amount that changed several times), and sometimes calculated its fee as equal

to the client's monthly payment in the program (up to $499).

49.     During 2001, ICS collected "enrollment" fees from more than 2,000

Massachusetts consumers, totaling over $500,000.  Nationwide ICS collected millions of dollars

in "enrollment" fees during 2001.  ICS provided no goods or services to consumers for those

enrollment fees.  Consumers paid these fees to obtain the purported benefits of Lighthouse's

credit counseling.  The up-front fees for credit counseling payable to ICS ($99.00 to $499.00)

exceeded statutory restrictions in many states which limit the amount of fees that credit

counselors may charge.  On information and belief, Lighthouse itself could not charge the

exorbitant enrollment fees without i) jeopardizing its fair share payments from creditors and/or

its non-profit status, and/or ii) violating numerous state law restrictions on credit counselors,

including statutes which limit the amount of up-front fees that credit counselors may charge.

50.     In January 2002, ICS changed the form of its up-front fee charged for credit

counseling, but maintained the same sales pitch described above, as reflected in ICS's revised

telemarketing scripts.  ICS telemarketers still solicited new clients for "non-profit credit

counselors," still performed the same "savings analysis" for prospective clients, and the ICS

17

sales pitch continued to focus on the savings offered by credit counseling. Beginning in 2002, however, in order to enroll in credit counseling, ICS began charging for "education" materials, which ICS called the "Money Matters" financial toolkit (hereafter "Toolkit"). All money charged for the Toolkit went to ICS.

51.   Like its sales process during 2001, ICS "enrolled" new clients and transferred them to Lighthouse only if they purchased the Toolkit. ICS now claimed that, once a person purchased the Toolkit, enrollment in credit counseling was "free." ICS, however, continued to serve as Lighthouse's gatekeeper, requiring that new clients purchase the Toolkit before transferring clients to Lighthouse. New clients in Lighthouse also still are required to pay Lighthouse monthly administrative fees of $38.00 ($25.00 of which Lighthouse pays to ICS). Thus, because of the up-front fee for the Toolkit and the monthly charges, credit counseling is not "free" as ICS claims.

52.   ICS has charged between $99.00 and $499.00 for the Toolkit, roughly the same as it previously charged for enrollment fees. Also like its enrollment fees, ICS has repeatedly changed the Toolkit price. ICS sometimes framed the Toolkit price as a flat fee on a sliding scale (in an amount that changed several times), and sometimes charged a fee equal to a client's monthly scheduled payment in the credit counseling program (up to $499). ICS telemarketers also told callers that the Toolkit was normally priced at $699.00, but that ICS, as a special offer, would charge a price equal to one monthly payment (between $99 and $499). Contrary to that claim, ICS has never charged a consumer $699 for the Toolkit.

53.   The Money Matters Financial Toolkit consists of four booklets on "Planning Your . . . Budget/ Credit/ Spending/ Savings" and a compact disk containing software to assist

financial planning.  ICS requires that new clients pay hundreds of dollars to buy the Toolkit in order to enroll with Lighthouse even though Lighthouse claims to provide its clients ongoing education related to household budgeting and finance.

54.     ICS's toolkit is unconscionably overpriced.  While charging consumers between $99 and $499, ICS has sold the Toolkits to credit counselors for resale, at a price of $15.00 each.  ICS's ability to sell the Toolkit for hundreds of dollars depends entirely on its offer to enroll purchasers in credit counseling;  ICS's sales pitch focuses almost exclusively on credit counseling, not the Toolkit.  Without the promise of enrollment in Lighthouse's credit counseling program, ICS could not sell the Toolkit for hundreds of dollars.  When consumers seek to return the Toolkit and obtain a refund, ICS advises that the consumer must be terminated from Lighthouse's program even though Lighthouse purports to be an independent, non-profit credit counselor.

55.     The Toolkit did not meaningfully alter the ICS plan to make money from Lighthouse's non-profit credit counseling through up-front fees and a portion of Lighthouse's monthly fees.  Now ICS continues to serve as a for-profit gatekeeper, charging excessive fees for the Toolkit before consumers may obtain credit counseling from Lighthouse.

56.     While the form of ICS's telemarketing efforts changed superficially, the substance remained the same: ICS charged hundreds of dollars in order for consumers to enroll in the non-profit credit counseling offered by Lighthouse.  The money paid by consumers as a result of the telemarketing transaction – enrollment fees and then for the Toolkit – is paid only to ICS.

## ICS's Development of the Toolkit and its Phony Royalty Agreement

57.     ICS, with the help of a paid consultant, developed the Toolkit and paid for its

production.

58.     On or about February 1, 2002, ICS signed a "Royalty Agreement" with

Community Credit Counseling Foundation ("CCCF"), a nonprofit corporation located at 15

Nottingham Drive in Watchung, New Jersey.  CCCF was formed as a non-profit credit

counseling organization, but is inactive.  As of January 2002, CCCF had no clients and offered

no goods or services.  CCCF president, Ms. Hari Ahrens, was a former business acquaintance of

Thomas Hewitt, an executive vice president of Flagship and ICS.  Hewitt contacted Ahrens and

she agreed to sign a contract with ICS.

59.     Neither CCCF nor Ahrens played any role in the development of the Money

Matters Toolkit sold by ICS, and neither owns any interest in the Toolkit.  Nonetheless, in the

"Royalty Agreement," CCCF purports to grant a license to ICS to use CCCF's name, goodwill,

trademark and logo in conjunction with the marketing and sale of the Toolkit.  In return, ICS

agreed to pay CCCF monthly payments totaling $100,000 during 2002.

60.     Since entering the contract, ICS has not used CCCF's name, trademark or logo in

connection with the Toolkit.  CCCF has provided no goods or services to ICS before or after the

contract.  ICS agreed to pay CCCF $100,000 for no goods, services, or property whatsoever.

The purpose of the contract, according to ICS management, was to allow ICS to contend it was

selling the Toolkit "on behalf of" CCCF, a nonprofit entity.  In fact, ICS sells the Toolkit only

for itself.

### ICS Telemarketing on Behalf of Mortgage Lenders

61.     ICS telemarketers sometimes used sales scripts that went beyond soliciting up-

front fees to enroll credit counseling clients.  On many days, ICS telemarketers, fielding in-

20

bound calls responding to ICS's pre-recorded message, described above, sought to either: a) enroll new Lighthouse clients and collect ICS's enrollment fee; or b) refer the caller to a for-profit mortgage lender to apply for a home equity/ debt consolidation loan.  At least one mortgage lender – First Horizon Home Loans Corp., a division of First Tennessee Corp., and one mortgage-related marketer – DPS (or Debt Planned Solutions) of Utah, paid ICS a fee for each prospective customer referred.

62.     When ICS was marketing mortgage loans, ICS still sent out the same pre-recorded messages promising interest rates as low as 1.5% and approval by a certified non-profit agency. ICS telemarketers then asked screening questions to learn whether the caller owned their home, whether they had equity in their home, and their credit condition.  If callers owned their home and reported either good credit or equity in their home, ICS either transferred the callers to a for-profit mortgage lender or collected information and forwarded the lead to the mortgage lenders or marketers.  The mortgage lenders, in turn, paid ICS a fee or commission for each referral.

63.     In the various pre-recorded phone messages sent by ICS to American households, ICS did not identify that it was marketing mortgage loan services and did not identify the provider of such services.

64.     Thousands of the pre-recorded messages communicated to households in Massachusetts and nationwide solicited new customers for for-profit mortgage lenders, in addition to soliciting payment to ICS of up-front fees related to "enrollment" or "education."

### ICS Relationship with American Consumer Credit Counseling

65.     Although the vast majority of persons who paid ICS up-front enrollment or education fees were enrolled in Lighthouse's credit counseling, ICS also enrolled callers in credit

21

counseling offered by American Consumer Credit Counseling, Inc. ("ACCC"), a non-profit corporation based in Newton, Massachusetts.  ACCC signed a contract with ICS in June 2001 and ICS began collecting enrollment fees and referring clients to ACCC later in 2001.

66.     ACCC understood that ICS would limit its up-front fee to $99.00 and that ICS would provide clients educational materials for that $99.00.  After ACCC learned that ICS was charging as much as $499.00 to enroll in credit counseling, ACCC terminated its relationship with ICS.

67.     ACCC also required that new clients be permitted to enroll with ACCC even if they did not want to purchase the Toolkit from ICS, and allowed clients to remain in credit counseling even if they sought a refund of enrollment or education fees paid to ICS. Nonetheless, ACCC learned that ICS *de facto* required new clients to pay ICS before they could enroll with ACCC and told clients seeking refunds that the client would be terminated from ACCC's credit counseling.

68.     ACCC clients also experienced great difficulty seeking refunds from ICS.  ACCC, at its own expense, reimbursed many clients for fees paid to ICS.  In or about March 2002, ACCC terminated its contract with ICS due to recurring problems with ICS, including those described above.

### Recent Pre-Recorded Phone Messages Using the Lighthouse Name

69.     In or after May 2002, ICS changed the text of its pre-recorded phone messages to identify Lighthouse, rather than ICS, as the source of the message.  The message remained substantively similar, claiming to offer interest rates as low as 1.5% and claiming approval by a non-profit agency.

22

70.     Callers responding to this new message still reached ICS's telemarketing center.
ICS telemarketers continued to solicit payment of fees, ranging between $99 and $499, for the
Money Matters Toolkit and/or for "enrollment." All up-front fees remained payable entirely to
ICS, not Lighthouse. Although the message purported to be from non-profit Lighthouse, ICS
prepared the pre-recorded message scripts, caused the messages to be broadcast, handled the
incoming phone calls, and retained all fees solicited during the resulting telemarketing
transaction.

71.     The pre-recorded messages identifying Lighthouse are misleading to consumers.
Although the messages imply that consumers are being solicited by non-profit Lighthouse, the
resulting telemarketing transaction solicits payment of money only to for-profit ICS. ICS and
Lighthouse fail to identify ICS in the pre-recorded messages and fail to disclose that the
telemarketer is soliciting fees payable to for-profit ICS. The pre-recorded message also fails to
disclose the type of goods or services offered by ICS or Lighthouse (there is no mention of the
Toolkit), the price of such goods or services, or who will be providing such goods or services.

72.     ICS and Lighthouse entered a revised contract dated May 23, 2002. Under that
contract, ICS continues to collect an enrollment fee from clients and also may continue to sell, at
any price, its educational materials to those clients.

### The Scope of ICS's Pre-Recorded Telemarketing and Sales

73.     Since it began telemarketing to solicit enrollment fees from new credit counseling
clients, ICS has sent at least one million unsolicited, pre-recorded commercial messages to
Massachusetts households. In a single day, ICS delivered as many as 120,000 pre-recorded
messages to Massachusetts residents. ICS's telemarketing has caused considerable annoyance

and inconvenience to Massachusetts residents, clogging answering machines with commercial messages and hanging up countless times when residents pick up the phone.

74.   Since it began telemarketing to solicit enrollment fees from new credit counseling clients, ICS has sent at least thirty million unsolicited, pre-recorded commercial messages to households nationwide, sometimes more than one million messages per day.

75.   Following ICS's misleading pre-recorded messages and misleading sales pitch, approximately 3,000 Massachusetts consumers have paid ICS up-front fees -- either enrollment fees or the price of the Toolkit – in order to enroll in credit counseling offered by Lighthouse or another non-profit credit counselor.  On information and belief, Massachusetts consumers have paid more than $1 million in fees to ICS following ICS's deceptive solicitation described above.

76.   More than 30,000 persons nationwide have paid ICS up-front fees in order to enroll in credit counseling offered by Lighthouse or another non-profit credit counselor, totaling more than $8 million.

77.   As a result of ICS's misleading pre-recorded message and misleading sales pitch, ICS has acquired more than 3,000 clients in Massachusetts, nearly all of whom pay Lighthouse $35 or $38 per month in "administrative fees."  The majority of those monthly fees are, in turn, paid by Lighthouse to ICS.

78.   Nationwide, more than 30,000 persons pay monthly administrative fees to Lighthouse, totaling more than $1 million monthly, the majority of which is paid over to ICS, unbeknownst to clients of non-profit Lighthouse.

79.   On or about October 25, 2002, more than five days prior to filing this action, the Attorney General provided notice to the defendants of his intent to bring suit under G.L. c. 93A

and provided an opportunity to discuss resolution of the claim, pursuant to G.L. c. 93A, § 4.

COUNT ONE

**Violation of the Telephone Consumer Protection Act 47 U.S.C. § 227 (b)(1)**

80.    The allegations contained in paragraphs 1-79 are incorporated herein by reference.

81.    Flagship and ICS have violated the TCPA, 47 U.S.C. § 227(b)(1)(B) and regulations promulgated thereunder, 47 C.F.R. 64.1200, by initiating telephone calls to residential telephone lines using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party.  These pre-recorded messages sent by ICS also were misleading and deceptive.

82.    The automatically dialed, pre-recorded phone messages initiated by ICS were for a commercial purpose, namely, i) soliciting enrollment fees payable to ICS, ii) selling ICS's Money Matters Toolkit, and/or iii) to refer potential customers to a for-profit mortgage lender in order for ICS to receive a fee from such lender.  ICS's pre-recorded messages included the transmission of an unsolicited advertisement, were communicated to persons that have no established relationship with ICS and who did not consent to receive the messages, and were made by or on behalf of ICS, a for-profit corporation.  When a caller responds to ICS's message – including those messages identifying Lighthouse, the telemarketing transaction that follows, if successful, results in consumers paying hundreds of dollars to for-profit ICS, not to Lighthouse or any other non-profit.

83.    With respect to those pre-recorded messages that identify Lighthouse instead of ICS but solicit money payable to ICS, ICS failed to identify the business or individual initiating the call, in violation of 47 C.F.R. 64.1200(d) and the TCPA.

25

84.     ICS and Flagship wilfully or knowingly violated the TCPA and regulations thereunder.

85.     Pursuant to Section 227(f)(1), the Massachusetts Attorney General brings this action to enjoin ICS and Flagship from sending pre-recorded phone messages in violation of the TCPA, to recover $500.00 for each violation of the TCPA by ICS, and to recover an increased award due to the willful and knowing nature of ICS and Flagship's violation of the TCPA.

## COUNT TWO

### Violation of the Telemarketing Sales Rule (16 C.F.R. Part 310)

86.     The allegations contained in paragraphs 1-85 are incorporated herein by reference.

87.     ICS and Flagship have violated the Telemarketing Sales Rule, 16 C.F.R. Part 310, by:

a)     failing to disclose to customers, in a clear and conspicuous manner and prior to a customer's payment for goods or services, the total costs to receive the goods or services that are the subject of the sales offer; all material restrictions, limitations or conditions related to the goods or services; and all material terms and conditions related to their cancellation/refund policies (16 C.F.R. § 310.3(a)(1));

b)     misrepresenting, directly or by implication, the total costs of goods or services offered; material restrictions, limitations or conditions related to such goods or services; material characteristics or aspects of performance of the goods or services; material aspects of the nature or terms of refund or cancellation policies; and misrepresenting the telemarketer's affiliation with a third party (16 C.F.R. § 310.3(a)(2)).

c)     making false or misleading statements to induce persons to buy goods or services (16 C.F.R. § 310.3(a)(4)).

d)     making outbound telemarketing calls and failing to disclose promptly and in a clear and conspicuous manner, to the person receiving the call, the identity of the seller of goods and services, and the nature of the goods and services being sold (16 C.F.R. § 310.4(d)).

26

88.     Pursuant to 15 U.S.C. § 6103, the Attorney General brings this action, as *parens*

*patriae* on behalf of Massachusetts residents, to enforce the defendants' compliance with the

Telemarketing Sales Rule, and to obtain damages, restitution and an injunction on behalf of

Massachusetts residents.

COUNT THREE

**Violation of c. 93A, Section 2(a)**

89.     The allegations contained in paragraphs 1-88 are incorporated herein by reference.

90.     The defendants, ICS and Flagship, have violated G.L. c. 93A, § 2(a) and

regulations promulgated thereunder pursuant to G.L. c. 93A, § 2(c) by engaging in various unfair

and deceptive acts or practices, including but not limited to the following:

a)      Misrepresenting to customers and potential customers material information, terms

and conditions concerning the goods and/or services offered for sale, in violation of G.L. c. 93A,

§ 2(a) and 940 C.M.R. § 3.05, including misrepresenting:

i)      the nature of goods or services offered for sale;

ii)     the savings or benefits offered by credit counseling, including by initially failing
        to disclose required fees and then by failing to take fees into account when
        claiming purported "savings" or reduced interest rates;

iii)    the effective interest rates paid during credit counseling, by promising rates not
        actually achieved (1.5% or 1.9%) *and/or* by failing to account for enrollment and
        monthly fees;

iv)     that enrollment fees and/or monthly administrative fees are tax deductible;

v)      that educational materials, or enrollment in credit counseling, are "free," without
        disclosing all terms and conditions that must be satisfied to recover up-front fees;

vi)     that payment to creditors is deferred for one month, or that ICS or Lighthouse
        would take care of one month's payment

27

vii)    that ICS is a not-for-profit enterprise or that monies paid to ICS are used to fund or advance non-profit credit counseling;

viii)    that monthly credit counseling fees are "administrative" in nature, or are used to fund Lighthouse's overhead or non-profit mission; and

ix)    that the Money Matters Toolkit is normally priced at $699, but offered for less.

b)    Failing to disclose to customers and potential customers, prior to "enrollment" or the receipt of up-front fees or monthly fees, material information concerning the goods or services offered by defendants, in violation of G.L. c. 93A, § 2(a), 940 C.M.R. § 3.16(2), and 940 C.M.R. § 3.13(1) and (2), including failing to disclose, to timely disclose, or to adequately disclose:

i)    the precise goods or services, if any, offered by ICS and for which ICS charges money;

ii)    the up-front fees charged by ICS, the monthly fees charged by Lighthouse, and/or the total fees payable to ICS and Lighthouse to participate in credit counseling;

iii)    during discussion of reducing interest rates and the "savings analysis," the impact of up-front and monthly fees upon purported savings, total payments to retire debt, duration of payments, and effective interest rates.

iv)    material terms, conditions and limitations of the credit counseling, including that credit cards must be canceled for duration of the program.

v)    all terms and conditions related to the claim that enrollment is "free" and related to the certificates from ICS entitling customers to payment or refunds;

vi)    that all calculations and claims of purported savings from credit counseling are based upon a comparison to a consumer who pays minimum monthly payments on all credit card debts for the duration of those debts.

c)    violating the TCPA and regulations thereunder, in violation of G.L. c. 93A, § 2(a) and 940 C.M.R. § 3.16(4), and unfairly entering into contracts and arrangements unfairly designed to avoid or circumvent TCPA proscriptions, including engaging in sham transactions;

d)      violating the Telemarketing Sales Rule, 16 C.F.R. Part 310, as set forth above, in violation of G.L. c. 93A, § 2(a) and 940 C.M.R. § 3.16(4);

e)      violating Massachusetts law governing telemarketers, G.L. c. 159, § 59E, by failing to immediately disclose during a telemarketing sales call the identity of the telemarketing company and the kind of goods or services being offered and by engaging in a plan, scheme or ruse that misrepresents the purpose or mission of a telemarketing sales call, in violation of G.L. c. 93A, §2(a) and 940 C.M.R. § 3.16(3);

f)      engaging in the business of mortgage brokering, as defined by G.L. c. 155E, § 1, by finding, offering to find, assisting in placement, or offering to assist in placement, of mortgage loans, without being properly licensed by the Division of Banks, in violation of G.L. c. 155E, § 2 and G.L. c. 93A, §2(a) and 940 C.M.R. § 3.16(3).

91.     ICS and Flagship have committed unfair or deceptive acts or practices by engaging in the business of credit counseling on a for-profit basis, including by creating debt payment plans, providing financial and budgetary advice, and/or providing educational services relating to use of credit, in violation of G.L. c. 93A, §2(a).

92.     Flagship and ICS also have engaged in unfair and deceptive acts or practices by abusing Lighthouse's status as a non-profit charitable corporation for the commercial gain of for-profit ICS.  ICS deceptively markets credit counseling services as non-profit in nature and consistently asserts Lighthouse's non-profit status, but fails to disclose that ICS solicits an up-front fee payable entirely to ICS, a for-profit telemarketing company.  ICS and Flagship fail to disclose to consumers the relationship between ICS and Lighthouse, including that clients, with few exceptions, may receive Lighthouse's non-profit credit counseling only after paying

29

hundreds of dollars to ICS; and that Lighthouse was founded by a former senior manager at

Flagship, ICS's parent company.  ICS and Flagship also have entered into contracts and

arrangements with Lighthouse for the unfair purpose of attempting to circumvent state statutes

which restrict the amount of fees that non-profit credit counselors may charge.

93.    The defendants knew of should have known that their actions were unfair or

deceptive in violation of G.L. c. 93A, § 2(a).

RELIEF REQUESTED

WHEREFORE, the Commonwealth requests that this court:

1.    Issue a permanent injunction prohibiting the defendants, ICS and Flagship, their

agents, employees, and all other persons and entities, corporate or otherwise, in active concert or

participation with any of them, from:

a)  violating the TCPA, including by communicating artificial or pre-recorded voice
recordings to Massachusetts residential phone numbers where the telemarketing transactions
generated by such phone messages: i) solicit, directly or indirectly, money payable to ICS,
Flagship or any other for-profit entity; or ii) solicit clients or new business for, or seek to identify
referrals to, any mortgage lender, mortgage broker, or any other for-profit entity;

b)  making outbound telemarketing calls, including communicating pre-recorded
messages, without disclosing promptly and in a clear and conspicuous manner, to the person
receiving the call, the identity of the seller of goods and services, and the specific nature of the
goods and services being offered;

c)  accepting or receiving any fees related to credit counseling – including i) enrollment
fees; ii) monthly or administrative fees, or iii) fees for educational goods or services related to
credit counseling or debt management that are offered at the same time as credit counseling
services are offered (hereafter "fees related to credit counseling") – without first disclosing to the
prospective credit counseling client:

i)        the total amount to be paid to ICS in advance of receiving credit counseling, that
            ICS is a for-profit telemarketing company, that none of the money payable to ICS
            goes to the non-profit credit counselor, and, if such is the case, that the consumer
            need not pay ICS in order to receive credit counseling from Lighthouse;

30

ii)     with respect to any proposed credit counseling payment schedule: the total
        amount that the consumer would pay to complete the program; of that program
        total, the amount that would be paid to creditors; and, of that program total, the
        amount that would be paid to the provider of debt management/credit counseling
        services and/or ICS;

iii)    if any comparison is made between the credit counseling program and paying debt
        without credit counseling: all presumptions employed with respect to paying debts
        without credit counseling, including what monthly payments are presumed; and

iv)     if any claims are made concerning savings achieved through credit counseling: a
        comparison between payments in the credit counseling program and paying the
        same monthly amount outside of credit counseling.

d)  Misrepresenting to the public or any person material information, terms and
conditions concerning any goods or services offered for sale by a defendant, including, but not
limited to, misrepresenting:

i)      that a person has received an approval letter or other form of approval or has been
        "approved" for credit counseling when no such approval has occurred or been
        mailed;

ii)     that defendants offer a credit card or an extension of credit;

iii)    that defendants can provide a certain interest rate (*e.g.*, "as low as" 1.5% or 1.9%)
        applicable to a consumer's debt to be repaid through credit counseling, unless the
        defendant can provide, and in fact provides, that precise interest rate (or
        a lower rate) specifically to the prospective credit counseling client;

iv)     that the monthly administrative fees payable to Lighthouse are tax-deductible;

v)      that fees payable to ICS for enrollment or educational goods or services are "free"
        or fully refundable, without simultaneously disclosing all terms and conditions
        required to obtain reimbursement of such fees;

vi)     that a client's payments to creditors were "deferred" for the first month or that
        ICS or Lighthouse would make the first monthly payment in the program.

e)  Failing to disclose to the public or any person, prior to acceptance, receipt or
solicitation of any money for goods or services, material information concerning any goods or
services offered for sale by a defendant, including failing to disclose, prior to accepting or
receiving any fees related to credit counseling, all terms, conditions and limitations of the credit
counseling program offered, including that credit cards must be cancelled in order to participate;

31

and any time delay before interest rates may be reduced or penalties or charges may be eliminated.

f) finding, offering to find, assisting in placement, or offering to assist in placement of residential mortgage loans, without being licensed by the Massachusetts Division of Banks.

g) creating debt payment plans, providing financial and budgetary advice, or providing educational services relating to the use of credit.

2.     Order the defendants to pay the Commonwealth, pursuant to 47 U.S.C. § 227(f)(1), $500.00 for each pre-recorded telephone message communicated to a Massachusetts residence in violation of the TCPA, and, if defendants' conduct is proven wilful or knowing, award the Commonwealth $1,500 for each such violation;

3.     Order the defendants to make full and complete restitution to each person injured by their unfair or deceptive acts or practices.

4.     Order the defendants to pay the Commonwealth civil penalties, attorneys' fees and costs pursuant to G.L. c. 93A, § 4.

5.     Grant such other and further relief as the Court deems equitable and proper.

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS

THOMAS F. REILLY
ATTORNEY GENERAL

Date: December 19, 2002      By:

Christopher Barry-Smith, BBO # 565698
Assistant Attorney General
Consumer Protection and Antitrust Division
Public Protection Bureau
One Ashburton Place
Boston, MA 02108
(617) 727-2200, ext. 2539

02-W-12431 JLT

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Commonwealth of Massachusetts

### DEFENDANTS
Integrated Credit Solutions, Inc.
Flagship Capital Services, Corp.

(b) County of Residence of First Listed Plaintiff **Suffolk County**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Christopher K. Barry-Smith, Asst. Atty. General
Office of the Attorney General, CPAD
One Ashburton Place, 19th Floor
Boston, MA 02108

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgement | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | **FEDERAL TAX SUITS** | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | Determination Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | or Defendant) | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | Security Act | 26 USC 7609 | State Statutes |
| | | ☐ 550 Civil Rights | | | ☒ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | 47 USC 227 (f) |
| | | | | | 15 USC 6103 |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
This is an action by the Massachusetts Attorney General for violation of the Telephone Consumer Protection Act pursuant to 47 USC 227 (f), the Telemarketing Sales Rule pursuant to 15 USC 6103 and for violation of Massachusetts G. L. c. 93A pursuant to c. 93A, §4.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE _____   DOCKET NUMBER _____

DATE  Dec. 19, 2002
Dec. 19, 2002   12/19/02

SIGNATURE OF ATTORNEY OF RECORD
_[signature]_

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

UNITED STATES DISTRICT
DISTRICT OF MASSACHUSETTS

02 CV 1 2 4 3 1 JLT

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY)

_Commonwealth of Massachusetts v. Integrated Credit Solutions, Inc._

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL
   COVER SHEET. (SEE LOCAL RULE 40.1(A)(1)).

    ___ I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    ✓ II.    195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,     *Also complete AO 120 or AO 121
             740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.       for patent, trademark or copyright cases

    ___ III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
             315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
             380, 385, 450, 891.

    ___ IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
             690, 810, 861-865, 870, 871, 875, 900.

    ___ V.    150, 152, 153.

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)). IF MORE THAN ONE PRIOR RELATED CASE
   HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

   _n/a_

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS
   COURT?
                                                        YES          (NO)

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE
   PUBLIC INTEREST?    (SEE 28 USC §2403)
                                                        YES          (NO)

   IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?
                                                        YES           NO

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE
   28 USC §2284?
                                                        YES          (NO)

7. DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE
   COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE
   SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).
   _No Mass. parties except Commonwealth._          YES          (NO)

    A.   IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?

         EASTERN DIVISION              CENTRAL DIVISION              WESTERN DIVISION

    B.   IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING
         GOVERNMENTAL AGENCIES, RESIDING IN MASSACHUSETTS RESIDE?

         EASTERN DIVISION              CENTRAL DIVISION              WESTERN DIVISION

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME _Christopher K. Barry-Smith, Asst Atty Gen._
ADDRESS _One Ashburton Place, 19th fl., Boston MA 02108_
TELEPHONE NO. _617. 727. 2200   x 2539_

(Cover sheet local.wpd - 11/27/00)